I respectfully dissent from the Opinion and Award of the majority because I do not believe plaintiff has met his burden under Holley v.ACTS, Inc., 357 N.C. 228, 581 S.E.2d 750 (2003), of proving a causal relation between his June 6, 2002, compensable injury by accident and his post-June 2002 neck condition.
Prior to plaintiff's employment with defendant-employer, plaintiff was involved in an automobile accident that resulted in neck fusion surgery in April 1998. Plaintiff received further surgery to his neck following his June 2002 workplace accident, although defendants have accepted only plaintiff's lumbar back injury as a compensable result of the accident. At issue in the present case is whether plaintiff has presented sufficient evidence to show that his neck condition and associated surgery following his June 2002 workplace accident were also the causal result of that workplace accident.
Of the expert medical testimony received by the Industrial Commission, neither Dr. Wadon nor Dr. Parikh opined that plaintiff's post-June 2002 neck condition was causally related to plaintiff's June 6, 2002, workplace injury. In fact, Dr. Parikh specifically opined that plaintiff's neck condition was unrelated to his June 6, 2002, injury:
 Q: Why do you feel that in this case, that it's not possible [that plaintiff re-injured his neck on June 6, 2002]?
 A: Based on my clinical examination, physical examination and reviewing the records, I feel that his neck injury was not related to the work-related injury — his neck problem is not related to the work-related injury he has in June 2002. *Page 21 
 Q: If a person has a surgery — if he's had surgery in `98, goes to work in November of `99 and is working full-time in a heavy-duty type job, what would be the cause for a surgery in — in 2002?
 A: Just a continuation of wear and tear in his neck, because he has two levels fused. There is always possibility that you require a surgery at the next level down because of wear and tear. I don't see any — reviewing the medical records, I don't see any acute injury to his neck.
The sole expert medical evidence presented by plaintiff to support a finding of causality between plaintiff's June 2002 workplace accident and the cervical condition for which plaintiff is currently seeking benefits lies in the expert medical testimony of Dr. Detamore.
Dr. Detamore testified that, on September 12, 2002, he took plaintiff's history and performed a detailed evaluation of plaintiff's condition. According to that history, upon lifting a heavy trailer wheel on June 6, 2002, plaintiff
 developed a sudden, sharp lancinating pain which radiated into his low back, buttock, and right leg and extended into his right foot. He told me that the pain was a burning sensation when he was relatively inactive, however, becoming a sharp stabbing and shooting pain when he attempted to move. He indicated this had been present since the injury, was not present prior to the injury. . . . He denied any signs or symptoms associated with cervical radiculopathy.
As Dr. Detamore explained, plaintiff's "complaint of his pain was of a radicular type of pain going into his leg and into his foot," constituting "some evidence of radicular signs to the right L5-S1," or in other words, a lumbar radiculopathy on the right side.
Dr. Detamore then performed a physical examination of plaintiff. The results of the physical examination indicated problems in three areas: (1) a lumbar radiculopathy, or pinched nerve leaving the lumbar spine; (2) a cervical radiculopathy, or pinched nerve leaving the neck; *Page 22 
and (3) myelopathy, or damage to the nerve within the spine itself, probably somewhere in plaintiff's cervical spine.
The indications of lumbar radiculopathy found by Dr. Detamore included the complaints of pain in plaintiff's low back and down plaintiff's right leg with which he presented to Dr. Detamore; a decreased pinprick sensation over L5-S1; the test of plaintiff's petallars, showing lumbar radiculopathy on the right; and the test of plaintiff's Achilles, which showed lumbar radiculopathy on the right as well as some lumbar radiculopathy on the left.
Despite plaintiff's explicit denial of awareness of any signs or symptoms of cervical radiculopathy, Dr. Detamore found indications of cervical radiculopathy including positive Erb's points and auxiliary compression tests on plaintiff's left upper extremity; a non-corrected left inferior internal rotational drift, indicating a minor motor control issue with plaintiff's left upper extremity; and evidence of motor radiculopathy in plaintiff's right upper extremity in his deep tendon petrels and triceps reflexes.
Finally, Dr. Detamore also found indications of myelopathy, or damage to the spinal cord itself, a worrisome condition that has been associated with certain major syndromes. The indications of myelopathy in plaintiff's lower extremities included a bilaterally symmetrical mild decrease in vibratory sensation in both lower extremities; bilateral pulse percussion tetany in both lower extremities; and the test of plaintiff's petallars, showing some myelopathy in addition to the lumbar radiculopathy described above. Dr. Detamore also found evidence of myelopathy in plaintiff's upper extremities, including the test of plaintiff's brachial radialis, suggesting myelopathy of plaintiff's left upper extremity; and a positive Hoffman test on plaintiff's left upper extremity, a sign of an upper motor neuron lesion somewhere in the spinal cord or in the *Page 23 
brain. The existence of indications of myelopathy in both plaintiff's lower and upper extremities suggested to Dr. Detamore that the mylopathy was located in plaintiff's cervical spine.
From his physical examination of plaintiff, Dr. Detamore diagnosed plaintiff with lumber radiculopathy, cervical radiculopathy, and cervical myelopathy. Dr. Detamore recommended a myelogram of plaintiff's spine, together with a CT scan. Following examination of the myelogram and CT scan, Dr. Detamore recommended and performed an anterior cervical discectomy, spinalectomy, osteophytectomy, bilateral foraminotomy, and partial carpectomy of the C3-4 and C4-5 levels of plaintiff's cervical spine. After performing plaintiff's neck surgery, Dr. Detamore retired from practice.
Regarding the issue presently before the Industrial Commission, Dr. Detamore opined that the surgery he performed on plaintiff's cervical spine was causally related to the June 2002 workplace lifting injury described to him by plaintiff. Dr. Detamore based his expert medical causality opinion on plaintiff's onset of symptoms following his workplace accident:
 His history indicated to me that he had no — none of the symptoms prior to doing this. Looking at the films, there's absolutely no question that those films demonstrated this pre-existing degenerative osteoarthritis. But he didn't come to me for a diagnosis of degenerative osteoarthritis. What he came to me for was complaints of pain which he said was in his low back and leg. The complaints of pain in my medical opinion was a combination of cervical myelopathy, cervical radiculopathy, spinal cord compression, and nerve root irritation which was brought on at the time of the lifting of this heavy weight. That's what caused these symptoms to become present even though he had the pre-existing condition of degenerative osteoarthritis.
However, Dr. Detamore's justification of his medical causality opinion is inconsistent with his own explanation of his examination and diagnosis of plaintiff. According to Dr. Detamore's testimony, plaintiff's complaints of low back and right leg pain were indicative only of a lumbar radiculopathy. Only following a comprehensive examination of plaintiff did Dr. Detamore *Page 24 
discover the more subtle, although apparently more worrisome, additional signs of cervical myelopathy and radiculopathy:
 When I examined him — and he did come to me with this complaint of a lumbar radicular complaint only. And yet on my examination, I found not as much of a problem with a lumbar radicular symptoms and signs on his examination. I found more of cervical both myelopathy and radiculopathy and that his focus was primarily on a lumbar radiculopathy symptoms.
Because plaintiff was not even aware that he had symptoms of cervical myelopathy and radiculopathy at the time he presented to Dr. Detamore — symptoms apparently limited to minor motor control issues in his arms and some weakness in his legs, and recognized by Dr. Detamore only after a thorough physical examination — there is no way to say whether those symptoms were present prior to, as well as following, plaintiff's June 2002 workplace accident. Dr. Detamore's description of his observations of plaintiff's condition in September 2002 would therefore have been the same, even if plaintiff's cervical myelopathy and radiculopathy were pre-existing conditions that were the direct result of plaintiff's existing degenerative osteoarthritis, as opined by Dr. Parikh. Only the onset of plaintiff's low back and right leg pain — and thus, plaintiff's lumbar radiculopathy — can be traced causally to the occurrence of plaintiff's June 2002 workplace lifting injury.
Because I do not believe that Dr. Detamore's expert medical testimony is sufficient to meet plaintiff's burden of showing that the cervical conditions for which plaintiff received treatment from Dr. Detamore causally resulted from plaintiff's June 6, 2002, workplace accident, I respectfully dissent from the majority's Opinion and Award.
This the __ day of August, 2007.
 S/_________________________
 BUCK LATTIMORE
 CHAIRMAN *Page 1